UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
 PATRICK CHIDUME,

                              Plaintiff,                    **OPINION AND ORDER**

v.

GREENBURGH-NORTH CASTLE                                     18-CV-01790 (PMH)
UNION FREE SCHOOL DISTRICT, et al.,

                              Defendants.
--------------------------------------------------------X

PHILIP M. HALPERN, United States District Judge:

Patrick Chidume ("Plaintiff") initiated this action by filing a complaint on February 27, 2018. (Doc. 1). That pleading was then twice amended. (Doc. 21; Doc. 24). The Second Amended Complaint alleged seven claims for relief in connection with Plaintiff's separation from employment, under: (i) Title VII of the Civil Rights Act of 1964 ("Title VII"); (ii) 42 U.S.C. § 2000e *et seq*.; (iii) New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296 *et seq*.; (iv) 42 U.S.C. § 1981; (v) 42 U.S.C. § 1983; and (vi) New York State law (claims of defamation, intentional and negligent infliction of emotional distress, and tortious interference with contract/*prima facie* tort). (Doc. 24, "SAC"). The matter proceeded initially against three individual defendants—Carolyn McGuffog, Superintendent of Schools ("Sup. McGuffog"), Robin Levine, Director of Pupil Personnel ("Dir. Levine"), and Robert Hendrickson, former Interim Principal of Clark School/Board President ("Dr. Hendrickson")—and the Greenburg-North Castle Union Free School District ("Defendant").

The Court, in a May 4, 2020 Opinion & Order (the "Prior Order"), dismissed all claims in the Second Amended Complaint except Plaintiff's Title VII and First Amendment retaliation

claims alleged against Defendant, only. (Doc. 49).[1] Defendant filed an Answer to the Second Amended Complaint on May 15, 2020 (Doc. 50), and the Court entered a discovery schedule on June 24, 2020 (Doc. 51). In October 2020, Plaintiff's counsel sought to be relieved, and the Court granted his motion. (Doc. 65). Plaintiff ultimately elected to proceed *pro se*. (Doc. 75). Discovery closed on August 4, 2021. (Doc. 94).

Defendant filed its pre-motion letter and Rule 56.1 Statement on October 15, 2021 (Doc. 100; Doc. 101, "Def. 56.1 Stmt.") in accordance with the deadlines set at the August 25, 2021 conference and in the Court's September 13, 2021 order (Doc. 95; Doc. 98). On November 5, 2021, Plaintiff filed his response to Defendant's Rule 56.1 Statement, together with an affidavit in opposition. (Doc. 108).[2] The Court waived its pre-motion conference requirement and set a briefing schedule for Defendant's motion. (Doc. 109).

Defendant filed its motion for summary judgment in accordance with the briefing schedule on December 13, 2021. (Doc. 110; Docs. 111-115; Doc. 116, "Def. Br."; Doc. 117). Despite service of the motion papers and *pro se* notice pursuant to Local Civil Rule 56.2, Plaintiff did not file opposition papers. (Doc. 118; Doc. 119). The Court, on February 3, 2022, *sua sponte* extended Plaintiff's time to oppose the motion (Doc. 122), and on March 3, 2022, Plaintiff filed a "Response in Opposition" (Doc. 123, "Pl. Opp."). The motion was fully submitted on March 11, 2022, with the filing of Defendant's reply to Plaintiff's November 5, 2021 response to Defendant's Rule 56.1 Statement. (Doc. 124, "Reply 56.1 Stmt.").

---

[1] This decision is available on commercial databases. *See Chidume v. Greenburgh-N. Castle Union Free Sch. Dist.*, No. 18-CV-01790, 2020 WL 2131771 (S.D.N.Y. May 4, 2020).

[2] Plaintiff combined his Rule 56.1(b) response and affidavit in opposition into one document. (Doc. 108). The Court hereafter refers to the first section of the document as "Pl. 56.1 CtnrStmt." (*id*. at 1-10) and the second section as "Pl. Aff." (*id*. at 11-15).

For the reasons set forth below, Defendant's motion for summary judgment is GRANTED.

## **BACKGROUND**

The Court recites the facts herein only to the extent necessary to adjudicate the extant motion for summary judgment and draws them from the Second Amended Complaint, Defendant's Rule 56.1 Statement together with Plaintiff's responses and Defendant's reply thereto, and the affidavits submitted in support of and opposition to the motion, together with exhibits. Unless otherwise indicated, the facts cited herein are undisputed.

Plaintiff was employed by Defendant as a social studies teacher from March 1998 until his retirement, effective June 20, 2018. (Def. 56.1 Stmt. ¶ 1; Pl. 56.1 CntrStmt. ¶ 1). Plaintiff served as the president of the Greenburgh United Teachers Union from July 1, 2014 until June 30, 2017. (Def. 56.1 Stmt. ¶ 3; Pl. 56.1 CntrStmt. ¶ 3). An unknown person, on January 24, 2017, made a report to the New York State Justice Center, resulting in a "Reported Significant Incident" involving Plaintiff. (Def. 56.1 Stmt. ¶¶ 4-6; Pl. 56.1 CntrStmt. ¶¶ 4-6). On March 17, 2017, Investigation Specialist Donna Umpenhour of the New York State Education Department's Office of Special Education Incident Management Unit notified Dr. Hendrickson that the New York State Education Department's Office of Special Education had completed its review of the January 24, 2017 Justice Center report. (Def. 56.1 Stmt. ¶ 4; Pl. 56.1 CntrStmt. ¶ 4; Doc. 111, "Rushfield Aff." Ex. C). Dr. Hendrickson, as a result of his receipt of the March 7, 2017 findings, met with Plaintiff and Sup. McGuffog on April 3, 2017. (Def. 56.1 Stmt. ¶ 9; Pl. 56.1 CntrStmt. ¶ 9). On April 7, 2017, Dr. Hendrickson issued a memo to Plaintiff setting forth remedial action in light of the New York State Education Department's Office of Special Education's findings, which directed Plaintiff to, *inter alia*, "[c]ease conducting union business either in person or on the phone during the day with the exception of [his] lunch time," to "remain in [his] classroom to provide instruction

and ensure a safe environment for [his] students" and to only "leave [his] classroom to conduct union business when directed by administration." (Def. 56.1 Stmt. ¶ 9; Pl. 56.1 CntrStmt. ¶ 9).

On May 22, 2017, a complaint was made to the Justice Center's Vulnerable Persons Central Registry alleging that Plaintiff was not teaching during class, was spending time on his phone conducting union business during class time and, with regard to one student, giving her a difficult time about leaving class to attend scheduled group counseling sessions contained in her IEP. (Def. 56.1 Stmt. ¶ 17; Pl. 56.1 CntrStmt. ¶ 17). Neither Plaintiff nor Defendant knows who made the May 22, 2017 complaint. (Def. 56.1 Stmt. ¶ 18; Pl. 56.1 CntrStmt. ¶ 18).

Plaintiff, in his capacity as Union President, filed several grievances against Defendant on behalf of various staff members in Defendant's employ. (SAC ¶ 13). On June 1, 2017, Plaintiff filed with Sup. McGuffog a group grievance on behalf of forty-two teaching assistants in Defendant's employ, concerning Defendant's decision to abolish those teaching positions. (Def. 56.1 Stmt. ¶ 10; Pl. 56.1 CntrStmt. ¶ 10). There was no one else present when Plaintiff filed the grievance with Sup. McGuffog that day. (Rushfield Aff. Ex. A, "Pl. Tr." at 27:3-10).

On or about June 8, 2017, a student and the student's classmate reported to Dr. Hendrickson that Plaintiff had made upsetting statements in class concerning marital rape; that he had told his class that he had to "take a shit, do you want to come with me?"; and that he had made other comments in class concerning sex and often swore in class. (Def. 56.1 Stmt. ¶ 12; Pl. 56.1 CntrStmt. ¶ 12). Dr. Hendrickson made a telephone report to the Justice Center concerning those allegations. (Def. 56.1 Stmt. ¶ 13; Pl. 56.1 CntrStmt. ¶ 13). The Justice Center provided an Immediate Protections Safety Assessment to Dr. Hendrickson to complete, which he completed and returned to the Justice Center on June 12, 2017. (Def. 56.1 Stmt. ¶ 13; Pl. 56.1 CntrStmt. ¶ 13; Rushfield Aff. Ex. E). The Assessment bore Identification Number 301-525840496 and was

classified as "abuse neglect." (Rushfield Aff. Ex. E). Dir. Levine, as Director of Pupil Personnel Services and the Chair of an Internal Review Committee that reviews Justice Center incident reports, was contacted by Defendant's counsel concerning the June 8, 2017 report. (Def. 56.1 Stmt. ¶¶ 14-15; Pl. 56.1 CntrStmt. ¶¶ 14-15; Doc. 113, "Levine Aff." ¶ 4). Defendant's counsel suggested that Dir. Levine interview Plaintiff's students in connection with that June 8, 2017 report. (Levine Aff. ¶ 4). Dir. Levine, without the presence, participation, or involvement of Sup. McGuffog, interviewed three students between June 14 and 15, 2017, with some limited auditing by counsel (Def. 56.1 Stmt. ¶¶ 15-16; Pl. 56.1 CntrStmt. ¶¶ 15-16; Rushfield Aff. Ex. F).

Sup. McGuffog, Dr. Hendrickson, and Dir. Levine received a letter from Senior Investigator Umpenhour on June 30, 2017, concerning the May 22, 2017 Justice Center report, as well a New York State Education Department Office of Special Education Written Findings of the Review of the Reported Significant Incident, with a determination date of June 29, 2017. (Def. 56.1 Stmt. ¶ 17; Pl. 56.1 CntrStmt. ¶ 17). The Written Findings included findings that Plaintiff was repeatedly sending students out of the class to make or obtain copies of packets for the class to use; that Plaintiff asked students to leave his class to get cups of coffee for him; that Plaintiff, staff members, and a student all reported that Plaintiff had refused to have support staff in his classroom and had sent them away when they arrived to class per the schedule; that Plaintiff refused to attend CSE meetings; and that Plaintiff did not send updates for IEPs or complete needed forms. (Rushfield Aff. Ex. G). Upon receipt of these Written Findings, Dr. Hendrickson in consultation with Sup. McGuffog, decided that Plaintiff should be transferred to the Greenburgh Academy, as that would avoid putting Plaintiff in a position in which he could retaliate against those students and be subject to allegations of reprisal by those students, whether founded or not. (Doc. 112, "Hendrickson Aff." ¶ 10; Doc. 115, "McGuffog Aff." ¶ 8). The Greenburgh Academy is one of

the junior/high schools comprising the Defendant school district, and Plaintiff had worked there in September 1998 through August 2005 prior to his transfer to Kenneth B. Clark Academy, where he was working in 2017 at the time of the events relevant to this action. (McGuffog Aff. ¶ 3; Def. 56.1 Stmt. ¶ 2; Pl. 56.1 CntrStmt. ¶ 2).

Accordingly, on June 30, 2017, Dr. Hendrickson issued a memo and "Critical Evaluative Letter" to Plaintiff concerning the June 29, 2017 Written Findings, and confirmed to Plaintiff that he had been the subject of several Justice Center complaints. (Def. 56.1 Stmt. ¶¶ 22-23; Pl. 56.1 CntrStmt. ¶¶ 22-23). Defendant was required to provide the State Education Department with a Residential School Action Plan ("RSAP"), so, on June 30, 2017, Dr. Hendrickson also prepared a RSAP setting forth the actions to be taken to address the concerns identified in the June 29, 2017 Written Findings. (Def. 56.1 Stmt. ¶¶ 24-25; Pl. 56.1 CntrStmt. ¶¶ 24-25). Senior Investigator Umpenhour advised Sup. McGuffog by letter dated July 5, 2017 that the New York State Education Department Office of Special Education Incident Management Unit considered the RSAP to "appropriately address the review findings." (Def. 56.1 Stmt. ¶ 26; Pl. 56.1 CntrStmt. ¶ 26). Included in the RSAP was the proposal to reassign Plaintiff to Greenburgh Academy. (Def. 56.1 Stmt. ¶ 25; Pl. 56.1 CntrStmt. ¶ 25). On July 17, 2017, during a meeting with Sup. McGuffog and Union President Anthony Nicodemo, Plaintiff was provided the RSAP prepared by Dr. Hendrickson on June 30, 2017, informed that he was being involuntarily transferred to the Greenburgh Academy, and handed a letter advising him of that transfer, effective September 5, 2017. (Def. 56.1 Stmt. ¶ 27; Pl. 56.1 CntrStmt. ¶ 27). Plaintiff contends that he was not given an opportunity to understand the reasons for this transfer or to defend against the allegations made against him. (Pl. 56.1 CntrStmt. ¶ 27).

Plaintiff, despite the fact there was nothing about working at the Greenburgh Academy that he deemed to be negative or disadvantageous for him, decided he would not accept the transfer and would not report to work at the Greenburgh Academy on September 5, 2017. (Def. 56.1 Stmt. ¶¶ 28-29; Pl. 56.1 CntrStmt. ¶¶ 28-29). On September 5, 2017, the first day of school for the 2017-18 school year, Plaintiff notified the Principal of the Greenburgh Academy that "look, I'm not coming in," without giving the Principal any reason why he was not reporting for work on that day. (Def. 56.1 Stmt. ¶ 39; Pl. 56.1 CntrStmt. ¶ 39). Plaintiff sought the medical care of a psychiatrist in order to avoid having to report to the Greenburgh Academy while still getting paid, using sick leave. (Def. 56.1 Stmt. ¶ 43; Pl. 56.1 CntrStmt. ¶ 43). Defendant treated Plaintiff as being on paid sick leave and used his accumulated contract sick days in his sick leave bank at a rate of 6.75 hours per sick day commencing on September 5, 2017 to pay Plaintiff a regular salary. (Def. 56.1 Stmt. ¶ 48; Pl. 56.1 CntrStmt. ¶ 48).

The District's Board of Education passed a resolution on April 27, 2018, authorizing Sup. McGuffog "to direct a comprehensive psychiatric examination and evaluation, including medical examination and evaluation, if necessary, of Employee No. 48 [i.e., Plaintiff], in accordance with the provisions of Section 913 of the Education Law" and directing "that Employee No. 48, submit their (sic) medical records, if any, to the extent and for the time as determined by the examining physician(s) to the Board designated examining physician(s) at or before such examination/evaluation." (Def. 56.1 Stmt. ¶ 52; Pl. 56.1 CntrStmt. ¶ 52).  Sup. McGuffog advised Plaintiff of that resolution by letter on April 27, 2018, directing Plaintiff to submit to a medical examination by a psychiatrist identified in the letter, and provide necessary medical records to that doctor, on or before May 25, 2018. (Def. 56.1 Stmt. ¶ 53; Pl. 56.1 CntrStmt. ¶ 53).

Plaintiff did not contact the psychiatrist, appear for a medical examination, or provide any medical records to the psychiatrist. (Def. 56.1 Stmt. ¶ 54; Pl. 56.1 CntrStmt. ¶ 54). Nevertheless, Defendant further approved sick leave authorizations for Plaintiff on May 25, 2018, May 29, 2018, May 30, 2018, May 31, 2018 and June 1, 2018. (Def. 56.1 Stmt. ¶ 48; Pl. 56.1 CntrStmt. ¶ 48). On June 2, 2018, Plaintiff submitted a letter advising Defendant that he was retiring as of June 20, 2018. (Rushfield Aff. Ex. B).

From September 5, 2017 through his retirement in June 2018, Plaintiff was paid his regular biweekly salary using accumulated contract sick days in his sick leave bank. (Def. 56.1 Stmt. ¶ 47; Pl. 56.1 CntrStmt. ¶ 47). Plaintiff's last regular biweekly paycheck of sick leave pay was paid to him on May 30, 2018, three days prior to his submission of the retirement letter, and no withholding of sick leave payments occurred prior thereto. (Def. 56.1 Stmt. ¶ 60; Pl. 56.1 CntrStmt. ¶ 60). Because Plaintiff remained employed by Defendant for only a part of June 2018 (i.e., until the effective date of his retirement), all of his remaining accumulated sick leave days sick pay for the period after June 1, 2018 was paid to Plaintiff on June 20, 2018. (Def. 56.1 Stmt. ¶¶ 47, 61; Pl. 56.1 CntrStmt. ¶¶ 47, 61).

The Justice Center gave notice to Plaintiff on October 17, 2017 that the allegations of psychological abuse bearing Incident Number 301-525840496 were found "unsubstantiated as abuse and neglect." (Pl. Aff. Ex. A).[3] This litigation followed.

---

[3] Plaintiff contends that this document exonerates him from the allegations in the June 8, 2017 report. The "Incident Number" set forth in the October 17, 2017 notice is indeed the same as the "Identification Number" set forth on the June 12, 2017 Assessment, and both reference the classification of such allegations as "abuse and neglect." However, the date of the incident in the June 12, 2017 Assessment is noted as June 8, 2017, whereas the date of the incident set forth in the October 17, 2017 notice is May 31, 2017. This discrepancy has not been addressed by the parties, but is immaterial to resolution of this motion.

Defendant now moves for summary judgment dismissing the remaining claims in the Second Amended Complaint.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and is genuinely in dispute 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Liverpool v. Davis*, 442 F. Supp. 3d 714, 722 (S.D.N.Y. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." *Sood v. Rampersaud*, No. 12-CV-05486, 2013 WL 1681261, at *1 (S.D.N.Y. Apr. 17, 2013) (quoting *Anderson*, 477 U.S. at 248). The Court's duty, when determining whether summary judgment is appropriate, "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Id.* (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)). Indeed, the Court's function is not to determine the truth or weigh the evidence; the task is material issue spotting, not material issue determining. Therefore, "where there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim are immaterial . . . ." *Bellotto v. Cty. of Orange*, 248 F. App'x 232, 234 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006)). Claims simply cannot proceed in the absence of sufficient proof as to an essential element.

"It is the movant's burden to show that no genuine factual dispute exists," *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)), and a court must "resolve all ambiguities and draw all

reasonable inferences in the non-movant's favor." *Id.* (citing *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003)). Once the movant has met its burden, the non-movant "must come forward with specific facts showing that there is a genuine issue for trial." *Liverpool*, 442 F. Supp. 3d at 722 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). The non-movant cannot defeat a summary judgment motion by relying on "mere speculation or conjecture as to the true nature of the facts . . . ." *Id.* (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)). However, "[i]f there is any evidence from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper." *Sood*, 2013 WL 1681261, at *2 (citing *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004)).

Should there be no genuine issue of material fact, the movant must establish also its "entitlement to judgment as a matter of law." *In re Davis New York Venture Fund Fee Litig.*, 805 F. App'x 79, 80 (2d Cir. 2020) (quoting *FIH, LLC v. Found. Capital Partners LLC*, 920 F.3d 134, 140 (2d Cir. 2019)). Stated simply, the movant must establish that the law favors the judgment sought. *Gonzalez v. Rutherford Corp.*, 881 F. Supp. 829, 834 (E.D.N.Y. 1995) (explaining "that summary judgment is appropriate only when . . . law supports the moving party"); *Linares v. City of White Plains*, 773 F. Supp. 559, 560 (S.D.N.Y. 1991) (explaining that summary judgment is appropriate when "the law so favors the moving party that entry of judgment in favor of the movant . . . is proper").

The Court is, of course, mindful that "[*p*]*ro se* litigants are afforded a special solicitude," which includes reading their filings "to raise the strongest arguments they suggest." *Mortimer v. City of New York*, No. 15-CV-07186, 2018 WL 1605982, at *9 (S.D.N.Y. Mar. 29, 2018) (internal quotation marks omitted). "It is through this lens of leniency towards *pro se* litigants that this Court

must consider a defendant's motion for summary judgment against a *pro se* plaintiff." *Adams v. George*, No. 18-CV-02630, 2020 WL 5504472, at \*5 (S.D.N.Y. Sept. 8, 2020). This status does not, however, excuse a *pro se* litigant from making the showing required to defeat summary judgment; he or she must offer more than "bald assertions, completely unsupported by evidence" to overcome the motion. *Wisdom v. Loiodice*, No. 17-CV-04837, 2020 WL 4431590, at \*4 (S.D.N.Y. July 31, 2020); *see also Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (explaining that the mere fact that a litigant is *pro se* "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment" (internal quotation marks omitted)); *Ross v. Koenigsmann*, No. 14-CV-01321, 2017 WL 9511096, at \*1 (N.D.N.Y. Aug. 16, 2017), *adopted sub nom. Ross v. Mannava*, 2017 WL 4338883 (N.D.N.Y. Sept. 29, 2017).

## ANALYSIS

Plaintiff contends that Defendant retaliated against him for filing the instant lawsuit in violation of Title VII by: (1) failing to properly pay Plaintiff for the February 2018 Winter Break; and (2) demanding that Plaintiff submit to an Education Law § 913 examination, resulting in the cessation of his pay in May 2018 for not complying with that demand. Plaintiff also contends that, because he filed a union grievance on behalf of teaching assistants, Defendant retaliated against him in violation of the First Amendment by: (1) initiating an investigation by the Justice Center; (2) failing to properly pay Plaintiff for the February 2018 Winter Break; and (3) demanding that Plaintiff submit to an Education Law § 913 examination, resulting in the cessation of his pay in May 2018 for not complying with that demand. These claims of retaliation derive from two independent sources: Title VII and the First Amendment.

I.   Title VII Claim

 "Claims of discrimination under Title VII are analyzed at the summary judgment stage under the burden-shifting test announced by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Howard v. City of New York*, 302 F. Supp. 2d 256, 260 (S.D.N.Y. 2004), *aff'd*, 363 F. App'x 805 (2d Cir. 2010). To establish a *prima facie* case for retaliation under Title VII, "an employee must show that (1) []he was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24 (2d Cir. 2014) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)).

If the plaintiff sets forth a *prima facie* case of discrimination, "the burden of production then shifts to the defendant to offer a legitimate, non-discriminatory rationale for the adverse employment action." *Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 973 F. Supp. 2d 386, 397 (S.D.N.Y. 2013), *aff'd*, 586 F. App'x 739 (2d Cir. 2014) (quoting *McDonnell Douglas*, 411 U.S. at 802-03). "If the defendant articulates a legitimate reason for the action, the presumption of discrimination raised by the *prima facie* case drops out, and the plaintiff has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision and that the plaintiff's membership in a protected class was." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 804).

Defendant maintains that it is entitled to judgment as a matter of law because the undisputed evidence establishes that the employment decisions alleged in the Second Amended Complaint were not adverse actions, such that Plaintiff has not established a *prima facie* case under Title VII. Specifically, Defendant argues that the uncontroverted evidence establishes that

Defendant properly paid Plaintiff for the February 2018 Winter Break and did not cease his receipt of sick pay in May of 2018 or at any time until the retirement notice.

A. <u>February 2018 Winter Break Pay</u>

The record establishes that Plaintiff was paid during the February 2018 Winter Break between February 19, 2018 and February 23, 2018, and that he was not treated as using paid sick leave units during that break. Plaintiff, to avoid reporting for work at the Greenburgh Academy on September 5, 2017, sought psychiatric medical care which entitled him to utilize paid sick leave from September 5, 2017 through his retirement in June 2018, with the exception of days on which the District's schools were closed. (Def. 56.1 Stmt. ¶¶ 38-47; Pl. 56.1 CtnrStmt. ¶¶ 38-47). On days in which the District's schools were closed, Plaintiff was paid his regular salary without deductions from his sick leave bank and received pay following his retirement for his remaining accumulated sick days. (Def. 56.1 Stmt. ¶ 47; Pl. 56.1 CtnrStmt. ¶ 47). Plaintiff's sick leave balance was not reduced after the February 2018 Winter Break. (Doc. 114, "Herrera Aff." ¶ 6; *id*. Exs. A, D).

Plaintiff admits that he was paid for the February 2018 Winter Break. (Pl. Tr. 232:7-15). He contends, however, that Defendant debited his sick bank for that pay and disputes the fact that Defendant did not treat him as using sick days during the February 2018 Winter Break. (Pl. 56.1 CtnrStmt. ¶ 49; Pl. Tr. at 220:19-221:11). Plaintiff testified that he kept his own record of how much sick leave remained in his bank, that he had not produced such record in discovery, and was not sure if he still had the record or had thrown it away. (Pl. Tr. at 221:3-23). The record evidence demonstrates that between February 19, 2018 and February 23, 2018, the dates on which the schools were closed for the February 2018 Winter Break (Herrera Aff. Ex. A), Plaintiff was not

treated as using sick leave units (*id.* Ex. D), and was paid a regular salary with pay remitted biweekly between September 15, 2017 and May 30, 2018 (*id.* Ex. B).

Plaintiff's self-serving and incomplete testimony, in the face of admissible documentary evidence, is insufficient to create a genuine dispute of fact. *See Brown v. Phipps*, No. 19-CV-04356, 2021 WL 3604664, at *5 (S.D.N.Y. Aug. 12, 2021); *see also Deebs v. Alstom Transp., Inc.*, 346 Fed. App'x 654, 656-57 (2d Cir. 2009) (explaining that plaintiffs' "own self-serving testimony" is insufficient to defeat summary judgment in the face of documentary evidence adduced during discovery); *Lozada v. Delta Airlines, Inc.*, No. 13-CV-07388, 2014 WL 2738529, at *5 (S.D.N.Y. June 17, 2014) (noting that "[plaintiff's] self-serving, incomplete, and inconsistent recollection is not sufficient to create a genuine dispute of fact in light of [defendant's] documented evidence"). Plaintiff's unsupported contentions, considered in light of the record in this case, are simply insufficient to establish a genuine issue of material fact. *See Patterson v. Patterson*, No. 20-CV-02552, 2022 WL 356513, at *6 (S.D.N.Y. Feb. 7, 2022). Accordingly, Defendant has established it is entitled to judgment as a matter of law concerning the alleged adverse action that Defendant failed to properly pay Plaintiff for the February 2018 Winter Break. Because Plaintiff failed to controvert that showing or raise a genuine dispute of material fact, summary judgment in Defendant's favor on this theory is warranted.

B. <u>Demand for Education Law 913 Examination and Alleged Cessation of Pay in May 2018</u>

"New York law specifically provides that a Board of Education is 'empowered to require any person employed by the board . . . to submit to a medical examination to determine the physical . . . capacity of such person to perform . . . her duties.'" *Kane v. Carmel Cent. Sch. Dist.*, 12-CV-05429, 2014 WL 7389438, at *8 (S.D.N.Y. Dec. 15, 2014) (citing N.Y. Edu. Law § 913). Defendant was entitled under New York law to require Plaintiff to submit to an Education Law §

14

913 examination and to advise that it would cease sick leave pay if he continued to refuse to report for such an examination. *Kurzius v. Bd. of Educ., Washingtonville Cent. Sch. Dist.*, 81 438 N.Y.S. 2d 824 (App. Div. 1981); *Gargiul v. Bd. of Ed. of Liverpool Cent. Sch. Dist.*, 416 N.Y.S.2d 119, 120 (App. Div. 1979) ("A Board of Education has a statutory right to order an employee to submit to a medical examination [Education Law, § 913] and may dismiss an employee who refuses to undergo such an examination.").

Under these circumstances, in which Plaintiff was out of work on extended paid sick leave—commencing with his scheduled September 5, 2017 date of transfer to the Greenburgh Academy through to his effective date of retirement on June 20, 2018—requiring a Section 913 examination "does not materially alter the terms and conditions of plaintiff's employment, and is not more disruptive than a mere inconvenience." *Kane*, 2014 WL 7389438, at *8 (citing *Stamos v. Glen Cove Sch. Dist.*, 78 F. App'x 776, 778 (2d Cir. 2003) (holding that a plaintiff's allegations of retaliation "are not sufficient to undermine a statutory mandate allowing the School District to request the [Section 913] examination")).

The record developed in discovery reveals that Defendant did not cease Plaintiff's receipt of sick pay in May of 2018, and no withholding of sick leave payments to Plaintiff occurred prior to his submission of his retirement notice on June 2, 2018. (Def. 56.1 Stmt. ¶¶ 60-61; Pl. 56.1 CtnrStmt. ¶¶ 60-61). Plaintiff's voluntary *paid* leave, which did not terminate despite Plaintiff's failure to submit to a Section 913 Examination, does not constitute an adverse employment action. *See Joseph v. Leavitt,* 465 F.3d 87, 91-92 (2d Cir. 2006) (holding a paid leave of absence pending the outcome of an investigation is not an adverse employment action), *cert. denied*, 549 U.S. 1282 (2007); *Wagner v. Cty. of Nassau*, No. 11-CV-01613, 2014 WL 3489747, at *7 n.4 (E.D.N.Y. July 11, 2014) (holding "[p]recedent suggests that forced, paid leave is not an adverse employment

action for a discrimination claim"). Plaintiff submitted his June 2, 2018 letter advising of his retirement effective June 20, 2018, and was paid on June 20, 2018 all of his remaining accumulated sick leave for the period after June 1, 2018. (Def. 56.1 Stmt. ¶¶ 60-61; Pl. 56.1 CtnrStmt. ¶¶ 60-61). Under the circumstances, no adverse action was in fact taken against him by Defendant. This theory, like the one based on the February 2018 Winter Break pay, fails.

In short, Defendant has established its entitlement to summary judgment on Plaintiff's Title VII retaliation claims as no adverse action has been established on which Plaintiff can maintain a *prima facie* case. Because Plaintiff failed to controvert that showing or raise a genuine dispute of material fact, summary judgment in Defendant's favor on Plaintiff's Title VII retaliation claims is warranted.

## II. First Amendment Retaliation Claim

Plaintiff's First Amendment retaliation claim is therefore reduced to Defendant's alleged retaliation against him for his union activity by initiating an investigation with the Justice Center, as the Court has concluded that the other two alleged adverse actions did not, as a matter of law, constitute adverse actions. This remaining claim "involves consideration of whether the plaintiff experienced an adverse action related to his or her employment as a result of protected conduct as opposed to alternative, legitimate, work-related reasons," so that "[t]o succeed on . . . First Amendment claims, [the plaintiff] must demonstrate by a preponderance of the evidence that the [conduct] at issue was protected, that he suffered an adverse employment action, and that there was a causal connection between the protected [conduct] and the adverse employment action." *Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 47 (2d Cir. 2014). A plaintiff must establish that that his protected conduct was "at least a substantial or motivating factor" in the employer's

employment decisions constituting adverse actions against him. *Collymore v. New York*, 767 F. App'x 42, 47 (2d Cir. 2019).

Plaintiff alleged in the Second Amended Complaint that he was advised by a Justice Center investigator on August 15, 2017 that he was being investigated in connection with an allegation that he inappropriately told students that a man had a "right" to rape his wife. (SAC ¶ 23). The record evidence establishes that there were multiple investigations involving Plaintiff which pre-date Plaintiff's filing the group grievance, including on January 24, 2017 and again May 22, 2017 concerning Plaintiff's classroom behavior. (Def. 56.1 Stmt. ¶¶ 4-6, 17-18; Pl. 56.1 CntrStmt. ¶¶ 4-6, 17-18). The specific Justice Center investigation to which Plaintiff refers that appears to have been initiated after the filing of the group grievance was actually initiated by a report made on or before June 8, 2017 by a student and the student's classmate to Dr. Hendrickson. (Def. 56.1 Stmt. ¶ 12; Pl. 56.1 CntrStmt. ¶ 12).

Defendant maintains that it is entitled to judgment as a matter of law because the undisputed evidence establishes that Plaintiff's union grievance filed on June 1, 2017 was not a substantial or motivating factor in the initiation of the Justice Center investigation following Dr. Hendrickson's report on June 8, 2017. The Court agrees.

A retaliation claim will lie even where "the measures taken by defendants were otherwise justified," so long as plaintiff can prove that retaliation was a "motivating factor." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene,* 746 F.3d 538, 544 (2d Cir. 2014) (citation omitted). "[T]he fact that [a defendant] had other legitimate reasons [for the action] is irrelevant." *Pekowsky v. Yonkers Bd. of Educ.*, 23 F. Supp. 3d 269, 279 (S.D.N.Y. 2014) (first alteration added). Here, Plaintiff has failed to adduce *any* evidence that retaliation was a motivating

factor in Dr. Hendrickson's decision to report the students' allegations made to him on or before June 8, 2017.

Plaintiff filed the group union grievance on June 1, 2017 with Sup. McGuffog on behalf of teaching assistants in Defendant's employ. (Def. 56.1 Stmt. ¶ 10; Pl. 56.1 CntrStmt. ¶ 10). There was no one else present when Plaintiff filed the grievance with Sup. McGuffog. (Pl. Tr. at 27:3-10). The uncontroverted evidence reveals that Dr. Henrickson did not even discuss the matter with Sup. McGuffog prior to making the telephone report to the Justice Center. (Def. 56.1 Stmt. ¶ 13; Pl. 56.1 CntrStmt. ¶ 13). The evidence further establishes that Dr. Hendrickson received reports from Plaintiff's student and the student's classmate that Plaintiff had made upsetting statements concerning marital rape; that he had told his class that he had to "take a shit, do you want to come with me?"; and that he made other comments concerning sex and often swore in class. (Def. 56.1 Stmt. ¶ 12; Pl. 56.1 CntrStmt. ¶ 12). Dr. Hendrickson, as Interim Principal, believed himself obligated to make a telephone report to the Justice Center of such allegations made by the students. (Hendrickson Aff. ¶ 7). Indeed, Dr. Hendrickson, as a mandatory reporter, likely was required by law to report the students' allegations. *See* N.Y. Soc. Serv. Law § 420; *cf. Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 274–75 (2d Cir. 2011) ("[S]chool administrators have a legal obligation to report suspected abuse and neglect to CFS. If such reports—inevitably based in part on the student's speech or conduct—could result in § 1983 liability, administrators would be exposed to civil liability no matter what they did. . . . Their only choice would be whether to suffer 42 U.S.C. § 1983 liability for reporting or N.Y. Soc. Serv. Law § 420 liability for not doing so.").

Dir. Levine, pursuant to Defendant's counsel's suggestion, conducted interviews of Plaintiff's students in connection with the Justice Center report made on or about June 8, 2017. (Levine Aff. ¶ 4; Rushfield Aff. Ex. F). He interviewed three students, without the presence,

18

participation, or involvement of Sup. McGuffog and with some limited auditing by counsel, and he prepared notes of those interviews. (Levine Aff. ¶ 4). The students interviewed by Dir. Levine reported: that Plaintiff provided little instruction to students during his class; that he was often observed on the telephone in class and would leave the class to talk on his cell phone or to go to the bathroom, leaving the students to have to be supervised through hallway observations by floor monitors; that he asked female students to make copies for him, requiring the students to be out of class for five to ten minutes at a time or so long as to require a student to miss the entire class period; that he would ask students to leave the class to heat up or make him coffee; that he would try to prevent a student from going to the student's scheduled counseling sessions; that he often made references to sex during class; that on one occasion, he told a student he was going to "take a shit" and asked her if she wanted to come and watch; that when staff came to the classroom door he would leave the class to talk with them; that he told his students that he had five wives; that of the five days in a school week, he would leave to take a phone call about every other day and could be gone for twenty minutes; that he would leave the class to meet with other staff members to talk about complaints in the District; and that he had spoken in class about it being acceptable to rape one's wife. (Levin Aff. ¶ 5; Rushfield Aff. Ex. F).

Plaintiff disputes the truth of each of allegations and attempts to manufacture an issue of fact by contending that those students were coerced into making false statements against him.[4] (Pl.

---

[4] Plaintiff points to a text message from a former student to a teacher assistant as the sole evidence of his allegation that the students were coerced into reporting their complaints to Dr. Hendrickson and Dir. Levine. (Pl. Tr. at 138:14-139:12). The former student, in that text message, expressed her belief that the "people that sit in the office" were trying to use her as a "scapegoat" and that she "told the lady" that if she was trying to "go after" Plaintiff, then she should go after all the teachers. (Doc. 83-1 at 7; Pl. Tr. at 116:6-121:3). This hearsay, even if credited as proof admissible on this motion, is insufficient to permit an inference that the June 8, 2017 reporting was an act of retaliation against Plaintiff for filing the group union grievance.

56.1 CntrStmt. ¶¶ 15, 21; Pl. Aff. ¶ 4). Plaintiff has not, however, proffered any evidence for his contention that Sup. McGuffog caused these allegations to be made against him with the Justice Center (SAC ¶ 16) or that she directed Dr. Hendrickson or Dir. Levine to meet with any of Plaintiff's students or report any allegations by those students to the Justice Center (Pl. Tr. at 42:24-44:16). Plaintiff's conclusory allegations of retaliation unsupported by evidence, and his self-serving testimony that the students falsely reported to Dr. Hendrickson, are insufficient to create a genuine dispute of fact in the face of the evidence adduced by Defendant. *Deebs*, 346 F. App'x at 656-57; *Patterson*, 2022 WL 356513, at *6; *Brown*, 2021 WL 3604664, at *5; *Lozada*, 2014 WL 2738529, at *5. Simply put, there is no evidence in this record that would support any claim that Dr. Hendrickson was motivated in any part in making that report by Plaintiff's filing of the group grievance with Sup. McGuffog.[5] Plaintiff's failure to prove that retaliation was a motivating factor in the decision to report the students' allegations to the Justice Center is fatal to his First Amendment claim and warrants summary judgment in Defendant's favor.

---

[5] Moreover, even if Plaintiff had established a causal connection between his protected First Amendment activity and the adverse action against him, Defendant would still be entitled to summary judgment on this claim. A First Amendment retaliation claim remains subject to several defenses. "[T]he employer may avoid liability by demonstrating that it would have taken the same adverse employment action 'even in the absence of the protected conduct.'" *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Ed.*, 444 F.3d 158, 163 (2d Cir. 2006) (quoting *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)). The question for the Court then, would be, absent Plaintiff's filing of the group grievance, would Defendant have reported the students' allegations thereby initiating the Justice Center investigation? On the record here, in which Dr. Hendrickson's decision to make the telephone report was a decision that any school district staff recipient of the student-delivered information given to him would be required to make as a mandatory reporter, no juror could infer that Defendant initiated a Justice Center investigation because it was displeased that Plaintiff exercised his right to file a union grievance on behalf of teaching assistants. *See Manon v. Pons*, 131 F. Supp. 3d 219, 234-36 (S.D.N.Y. 2015); *cf. Cox*, 654 F.3d at 274-75. Thus, even were the Court to have found that Plaintiff established causation, Defendant would still escape liability through its proof that it would have taken the same action in the absence of the protected activity. *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 115 (2d Cir. 2011).

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED and the Second Amended Complaint is dismissed.

The Clerk of Court is respectfully directed to terminate the motion sequence pending at Doc. 110, close this case, and mail a copy of this Memorandum Opinion and Order to Plaintiff.

**SO ORDERED:**

Dated:   White Plains, New York
         June 28, 2022

_____
PHILIP M. HALPERN
United States District Judge